# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **C. CHRIS MADUKA,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TROPICAL NATURALS, LTD.,** | : | **No. 17-1835** |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                      SEPTEMBER 10, 2019

Chinjindu Chris Maduka claims that he developed a brand of "African black soap" and related body care products which he markets and sells using the marks DUDU OSUN and DUDU OSUM.[1] Mr. Maduka alleges that Tropical Naturals, Ltd.—a Nigerian entity that sells African black soap, among other things—infringed on his DUDU OSUN mark by selling products to businesses in the United States and elsewhere that bear the DUDU OSUN mark. He brings claims for trademark infringement and unfair competition under both federal and Pennsylvania law, and he seeks to recover $1,020,665.68, Tropical's alleged profits from its use of the DUDU OSUN mark in the last six years.[2]

---

[1]      Any reader of this Memorandum may understandably be disquieted by the very close similarity ("N" v. "M") in the two marks. Great care has been taken to guard against typographical errors in the Memorandum. Indeed, during the trial in this case clear diction was emphasized for the Court, counsel and witnesses. The difference is important for the case as a whole.

[2]      Although Mr. Maduka asserted claims for false designation of origin and trademark dilution in his complaint, *see* Mr. Maduka's Compl. at ¶¶ 25–49, and he briefly referenced these claims in his proposed findings of fact and conclusions of law, *see* Mr. Maduka's Proposed Findings of Fact and Conclusions of Law at ¶ 111, he did not discuss the elements of these claims in his proposed findings of fact and conclusions of law, and he did not otherwise articulate how the Court could find in his favor on such claims. When questioned on the lack of briefing on these issues during oral argument, Mr. Maduka's counsel stated that he is only focused on the trademark infringement and unfair competition claims. *See* July 12, 2019 Oral Argument Tr. (Rough) at

Tropical asserts counterclaims against Mr. Maduka for trademark infringement and unfair competition and claims that it is the rightful owner of the DUDU OSUN mark. Tropical seeks to recover $29,235.02, Mr. Maduka's alleged profits from his use of the DUDU OSUN and DUDU OSUM marks in the last six years, and its attorneys' fees, and it moves for a permanent injunction barring Mr. Maduka from using the disputed marks. Tropical also asks the Court to order the United States Patent and Trademark Office to cancel Mr. Maduka's registration for the DUDU OSUM mark as well as Mr. Maduka's pending application for the DUDU OSUN mark.

The Court presided over a three-day bench trial and later heard oral argument on the parties' proposed findings of fact and conclusions of law. Upon consideration of these proceedings and the evidence presented therein, the Court concludes, as set forth below, that:

(1) DUDU OSUN and DUDU OSUM are valid and legally protectable trademarks;

(2) Tropical, not Mr. Maduka, is the owner of the DUDU OSUN trademark;

(3) Tropical's ownership of the DUDU OSUN trademark predated any legally cognizable use in commerce by Mr. Maduka of the DUDU OSUM mark;

(4) Because, as the parties stipulated, the DUDU OSUM mark is confusingly similar to the DUDU OSUN mark, Tropical's prior ownership of the DUDU OSUN mark prevents Mr. Maduka from acquiring ownership rights in the DUDU OSUM mark;

(5) Tropical is entitled to a permanent and nationwide injunction restraining Mr. Maduka, his agents, and his employees from any use of either the DUDU OSUN or DUDU OSUM mark, or of any confusingly similar mark, in connection with the sale of African black soap or other body care products;

(6) Tropical is not entitled to a disgorgement of profits;

(7) Tropical is entitled to attorneys' fees;

(8) The Court will issue an order for cancellation by the U.S. Patent and Trademark Office of Mr. Maduka's DUDU OSUM registration; and

---

11:9–19 ("The trademark and the unfair competition. That is it."). Therefore, the Court concludes that Mr. Maduka has waived or otherwise abandoned false designation of origin and trademark dilution claims, and the Court does not address them here.

(9) The Court will not order cancellation of Mr. Maduka's DUDU OSUN application.

**FINDINGS OF FACT**

## I.    Background

1.      In this trademark case, the parties dispute the rightful ownership of the marks DUDU OSUN and DUDU OSUM but agree that those trademarks, with or without the use of a hyphen, are likely to cause consumers to be confused as to the source, sponsorship, or affiliation of goods when seeing the marks used on and in connection with soap and body care products. *See* Stipulations of Fact at ¶ 4.

2.      Plaintiff and Counterclaim Defendant Chinjindu Chris Maduka is an individual who resides in Lansing, Michigan. *See* Trial Tr. Day 1 at 9:5–7. He immigrated to the United States from Nigeria in 1981 and is a United States citizen. *See id.* at 9:8–12.

3.      Defendant and Counterclaim Plaintiff Tropical Naturals, Ltd. is a Nigerian company. *See* Stipulations of Fact at ¶ 7. The parties agree that a company known as Cosmos Chemicals is the predecessor-in-interest to Tropical such that, for purposes of this case, Cosmos and Tropical may be considered to have been the same company. *See id.* at ¶ 8; *infra* note 3.

4.      Mr. Maduka and Tropical both sell soap products, including bar soap, known in the soap industry as "African black soap." *See id.* at ¶ 1.

5.      African black soap is especially popular in Nigeria and nearby West African countries and is also popular in the United States, particularly with immigrants from West African nations. *See id.* at ¶ 2.

3

## II. The Parties' Use of the Disputed Marks

### A. Tropical

6.      Tropical presented evidence of its use of the DUDU OSUN mark. *See id.* Tropical does not claim to have ever used the DUDU OSUM mark, but nonetheless claims that Mr. Maduka does not have rights to use either mark because Tropical established ownership rights to DUDU OSUN first, thus preventing subsequent, or junior, users from using confusingly similar marks, like DUDU OSUM.

#### 1. Origin of the DUDU OSUN Mark

7.      Abiola Ogunrinde, the founder and owner of Tropical, *see* Trial Tr. Day 2 at 4:11–13, offered detailed testimony concerning the origin of the DUDU OSUN mark and how Tropical developed it. *See id.* generally.

8.      Mr. Ogunrinde has a background in chemistry and, prior to forming his own company, worked for Unilever PLC where he oversaw the manufacture of several products, including soap. *See id.* at 9:20–10:17.

9.      Following his work at Unilever, Mr. Ogunrinde founded Cosmos Chemicals—Tropical's predecessor in interest[3]—where he first began to manufacture and sell fillers for paint and tile in 1991. *See id.* 45:1–18.

10.     However, in 1995, after an economic downturn in Nigeria, Mr. Ogunrinde changed his business model and started manufacturing and selling African black soap in Nigeria using the DUDU OSUN mark. *See id.* at 45:19–48:11.

---

[3]     Because the parties have stipulated that, "for purposes of this case, Cosmos and Tropical may be considered to have been the same company," *see* Stipulations of Fact at ¶ 4, the Court uses "Tropical" to refer to both Cosmos and Tropical throughout this Memorandum.

11.     Mr. Ogunrinde explained that Tropical's DUDU OSUN soap is different from traditional Western soaps—which are made from animal fat—because it is made from vegetable oil and other natural products, including palm kernel oil, cocoa pod ash, palm ash, shea butter, honey, lime juice, lemon juice, aloe vera, and camwood. *See id.* at 47:9–48:3; Ex. D-34.

12.     Mr. Ogunrinde testified that he developed the name DUDU OSUN by taking the words for "black" and "camwood" from Nigeria's four major languages[4] and testing those words in different combinations to see how they would be received by consumers. *See* Trial Tr. Day 2 at 48:12–50:5. Mr. Ogunrinde eventually settled on the combination of "dudu," which means "black" in Yoruba, and "osun," which means "camwood" in Yoruba. *See id.*

13.     Mr. Ogunrinde presented multiple photographs of how the DUDU OSUN mark originally looked in the 1990's. *See id.* at 52:17–53:5; Exs. D-12A through D.

14.     He explained that he chose the grass logo—located next to the DUDU OSUN mark on Ex. D-12A—to represent the "herbal" nature of the black soap. *See* Trial Tr. Day 2 at 52:17– 53:2. He further explained that he did not design the grass logo; rather, he picked it from clip art on his computer. *See id.* at 52:19–24.

15.     Mr. Ogunrinde testified that Tropical changed the packaging for its DUDU OSUN soap in 2007. *See* Trial Tr. Day 2 at 56:8–57:16. At that time, it transitioned from the original brown-and-white box to the green box presently in use today. *See id.*; Exs. D-8 and D-34.

---

[4]     Mr. Ogunrinde testified that there are over 250 languages in Nigeria. *See* Trial Tr. Day 2 at 48:14. He identified Yoruba, Hausa, Igbo, and Edo as Nigeria's "four major languages." *See id.* at 48:20–21.

5

## 2. Tropical's Use of the DUDU OSUN Mark in United States Commerce

16.     Mr. Ogunrinde testified that third-parties who bought Tropical's DUDU OSUN soap in Nigeria began importing it into the United States in 1996. *See* Trial Tr. Day 2 at 15:4–16:1; 63:13–18.

17.     Mr. Ogunrinde admitted, however, that his earliest documentation of Tropical shipping products directly into the United States is from 2001, some five years after he had actually imported the products into the United States. He claimed that Tropical has been selling DUDU OSUN soap in the United States ever since. *See id.* at 15:4–16:16.

18.     Tropical supported Mr. Ogunrinde's testimony with one invoice from December 2001 reflecting a shipment of one hundred cartons—4,800 bars—of Tropical's DUDU OSUN soap to International Beauty Care Company, a distributor in California. *See id.* at 65:15–66:6; Ex. D-17A.

19.     Dr. Churchill Idah, who operates International Beauty Care Company, testified that he has been importing DUDU OSUN soap manufactured by Tropical for sale in the United States continuously from 2001 through the present. *See* Trial Tr. Day 3 at 35:4–11. He further testified that, since that time, he has sold Tropical's DUDU OSUN soap to distributors nationwide, *see id.* at 35:12–36:14, who then sell the soap to retailers, who in turn sell the soap to consumers. *See id.* at 36:23–37:1.

20.     The parties stipulated that International Beauty Care Company "has been distributing [DUDU OSUN] branded soap *throughout the United States* as manufactured by Cosmos Chemicals and later by Tropical Naturals at least on or around the dates reflected upon Defendant's Exhibits D-2A through Y, D-4A and B, and D-17A." Trial Tr. Day 3 at 29:21–30:7 (emphasis added).

6

21.     The exhibits referenced in that stipulation show the importation of over 150,000 bars of Tropical's DUDU OSUN soap from December 14, 2001 through April 27, 2016. The earliest invoice is the December 2001 invoice, *see* Ex. D-17A, the next invoice is from February 2008, *see* Ex. D-2W, and the remainder of the invoices are dated between 2008 and 2016. *See* Exs. D-2A through Y, D-4A and B.

22.     Tropical also presented documentation of a sale of 48,000 bars of soap to a different distributor in Virginia in May 2002 for $28,479.00. *See* Trial Tr. Day 2 at 66:7–68:15; Ex. D-17B.

23.     Although Tropical did not present any invoices demonstrating sales between May 2002 and February 2008, it presented other evidence of continued use of the DUDU OSUN mark in the United States during those years.

24.     For example, Tropical's DUDU OSUN soap was advertised in the United States in the Africa Imports catalog in the Fall/Winter 2002 and Summer 2004 editions. *See* Trial Tr. Day 2 at 69:2–70:16; Ex. D-1A and B. Tropical's DUDU OSUN soap was also advertised in the Africa Imports catalog in the Spring 2009 and Spring 2011 editions. *See* Trial Tr. Day 2 at 70:17–71:15; Exs. D-1C and D.

25.     The Africa Imports catalog was distributed "all over the United States." *See* Trial Tr. Day 2 at 69:20–22.

26.     Mr. Ogunrinde also testified that he received several letters from customers in the United States who expressed their appreciation for DUDU OSUN soap or their desire to purchase more of the product. *See* Trial Tr. Day 2 at 77:14–85:10. The following correspondence was admitted into evidence:

> i.  An August 2002 letter from a customer in Kansas, *see* Ex. D-14E;
>
> ii. An August 2003 e-mail from a customer in Delaware, *see* Ex. D-14D;

iii. A February 2004 letter from a customer in Florida, *see* Ex. D-14A;

iv. An April 2004 letter from a customer in Ohio, *see* Ex. D-14B;

v. A July 2005 letter from a customer in New York, *see* Ex. D-14C;

vi. A September 2005 letter from a customer in Pennsylvania, *see* Ex. D-14F; and

vii. A January 2007 letter from a customer in California. *See* Ex. D-13B.

27. Tropical presented an unobjected to letter from Deloitte, its outside auditor, which stated that, from December 2013 through the end of 2017, Tropical had $218,090.00 worth of sales of DUDU OSUN soap in the United States. *See* Trial Tr. Day 2 at 28:18–30:7; Ex. P-8.

28. Mr. Ogunrinde testified—and submitted a cumulative sworn declaration stating— that Tropical's sales of DUDU OSUN soap in the United States for 2018 through February 2019 were approximately $802,575.00. *See* Trial Tr. Day 2 at 30:8–31:7.

### B. Mr. Maduka

29. At trial, Mr. Maduka presented evidence purporting to show his use of both the DUDU OSUN mark and the DUDU OSUM mark. *See* Trial Tr. Day 1 generally.

#### 1. Origin of the DUDU OSUN and DUDU OSUM Marks

30. Mr. Maduka testified that his family has been making black soap in his native village in Nigeria for generations. *See* Trial Tr. Day 1 at 11:9–24.

31. He claimed that he started manufacturing black soap and other beauty products for sale in Nigeria in 1983. *See id.* at 16:25–17:5.

32. He testified that he came up with the idea to use the name DUDU OSUN because the people in his native village referred to black soap by that name. *See id.* at 12:16–24. He testified that he created the name DUDU OSUM to differentiate between solid soap—for which

8

he uses the DUDU OSUN mark—and liquid products (like liquid hand soap, shampoo, and conditioner)—for which he uses the DUDU OSUM mark. *See id.* at 13:1–3.

33. Mr. Maduka, however, did not mention using DUDU OSUN for solid products and DUDU OSUM for liquid products in his responses to Tropical's pre-trial discovery interrogatories about the origins of the names.

34. Instead, in response to interrogatories, Mr. Maduka stated that he developed the name DUDU OSUN because, in Nigerian street language or slang, "dudu" means "funky," and "osun" means "camwood." *See id.* at 43:20–45:20. And Mr. Maduka stated that he used the name DUDU OSUM because it conveyed that his products were "awesome." *See id.* at 45:21–45:25.

35. On cross-examination, Mr. Maduka also admitted that he has labeled several liquid products with the DUDU OSUN mark, thus contradicting his explanation for why he labeled some products as DUDU OSUN and some as DUDU OSUM. *See id.* at 47:4–50:9; 54:1–3; *see also* Exs. D-21B and C (depicting Mr. Maduka's use of the DUDU OSUN mark on liquid products).

36. Mr. Maduka attempted to downplay this inconsistency, explaining that he generally follows the solid and liquid distinctions in his labeling practices for purposes of "strategic marketing," *see* Trial Tr. Day 1 at 51:13–17, but that he sometimes allows his customers to decide whether they want the products they are purchasing to be labeled DUD OSUN, DUDU OSUM, or with some other name. *See id.* at 59:14–21.[5]

37. This general lack of consistency rendered Mr. Maduka's testimony about the origins of the marks problematic.

38. Mr. Maduka testified that he designed the grass logo that appears on his DUDU OSUM products himself with assistance from family members. *See* Trial Tr. Day 1 at 80:20–81:2;

---

[5] For example, Mr. Maduka testified that some customers—including health food stores—prefer that his black soap carries the name "Apure." *See* Trial Tr. Day 1 at 17:8–20.

9

Ex. P-1. Mr. Maduka further testified that he did not use the grass logo until around 2005. *See id.* at 74:17–20.

39. However, as discussed above, Tropical presented photographic evidence that it was using a nearly identical grass logo on its DUDU OSUN products in Nigeria in 1999, *see* Trial Tr. Day 2 at 52:2–53:6; Ex. D-12A, as well as in industry periodicals circulated in the United States beginning in 2002. *See* Trial Tr. Day 2 at 69:8–70:6; Ex. D-1A.

40. This timeline of events, the close resemblance between Mr. Maduka's and Tropical's grass logos, *compare* Ex. P-1 to Ex. D-12A, and the fact that Mr. Maduka offered no actual explanation as to how he developed the grass logo, greatly undermines the claim that Mr. Maduka originated the logo.

41. Mr. Maduka's black soap contains several of the same ingredients as Tropical's black soap, including palm ash, lemon juice, lime juice, and shea butter, but it also has additional ingredients that are not included in Tropical's soap, including plantain pulp and mango butter. *See* Trial Tr. Day 3 at 15:9–16:19.

### 2. Mr. Maduka's Use of the Marks in United States Commerce

42. Mr. Maduka owns several companies through which he manufactures and sells black soap and other beauty and skin care products, including Apure, USA Africa Trade and Development Corp., and Success Products USA. *See* Trial Tr. Day 1 at 10:9–11:8; 29:18–30:3.

43. Referencing two invoices, Mr. Maduka testified that he first used the DUDU OSUN mark to sell black soap in the United States in 1986. *See id.* at 24:3–27:25; Ex. P-6 at MDK-0009, MDK-0108. Mr. Maduka further testified that he has used the DUDU OSUN mark in United States commerce continuously since 1986. *See* Trial Tr. Day 3 at 52:12–25.

10

44.     However, the invoices Mr. Maduka offered to support his claims were only faintly legible photographs of purported invoices, not copies of the invoices themselves. *See* Ex. P-6 at MDK-0009, MDK-0108.[6]

45.     Moreover, only one of the invoices from 1986 used the name "Dudu Osun" to identify Mr. Maduka's black soap. *See id.* at MDK-0108.

46.     The other invoice from 1986 identified Mr. Maduka's black soap as "Apure Dudu Black Soap," not "Dudu Osun." *See id.* at MDK-0009.

47.     Even considering all of the products identified as "Dudu," the two invoices from 1986 account for no more than \$72 worth of sales. *See id.* at MDK-0009; MDK-0108.

48.     After the 1986 invoices, the earliest invoice that Mr. Maduka offered into evidence is from December 2000. *See id.* at MDK-0212; Trial Tr. Day 1 at 84:5–21.

49.     The December 2000 invoice does not identify Mr. Maduka's black soap as "Dudu Osun." Rather, it identifies his black soap as "Dudu Raw Africa Black Soap," "Apure Dudu Raw Black Soap (Balls)," and "APure Dudu Liquid Black Soap." *See* Ex. P-6 at MDK-0212.

50.     Mr. Maduka produced two invoices from 2001. *See id* at MDK-0059, MDK-0220.

51.     Only one of these invoices identified Mr. Maduka's product as "Dudu Osun." *See id.* at MDK-0220.

52.     The other 2001 invoice identified Mr. Maduka's product as "APure Dudu Black soap." *See id.* at MDK-0059.

53.     Even considering all of the products identified as "Dudu," the three invoices from 2000 and 2001 account for only \$2,089.26 worth of sales.

---

6       Although Mr. Maduka's counsel provided "blown up" photographic versions to the Court, the text of the invoices was still extremely difficult, bordering on impossible, to read. *See* Trial Tr. Day 1 at 23:8–27:16.

11

54. Mr. Maduka produced one invoice each from 2009, 2010, 2011, 2012, and 2014. *See id.* at MDK-0190, MDK-0199, MDK-0202, MDK-0205, and MDK-0195.

55. The 2009 and 2014 invoices showed sales of DUDU OSUM products. *See id.* at MDK-0190, MDK-0195.

56. The 2012 invoice showed sales of DUDU OSUN products. *See id.* at MDK-0205.

57. The 2010 and 2011 invoices showed sales of both DUDU OSUN and DUDU OSUM products. *See id.* at MDK-0199, MDK-0202; Trial Tr. Day 1 at 83:5–84:4.

58. Combined, these invoices show less than $40,000 in sales for all "DUDU"-related products.

59. To the extent Mr. Maduka testified to use of the marks in the gaps between the times for which he actually presented invoices, that testimony was not credible because of the lack of documentation, because of the low volume of sales in the invoices actually presented, and because he lacked any other supporting evidence of use of the marks during those times, such as photographs, advertisements, letters from consumers, storage or bills of lading or other records of use of the marks in the ordinary course of trade.[7]

60. Mr. Maduka testified that he has over 30-years' worth of boxes containing thousands of invoices for the sales of DUDU OSUN and DUDU OSUM products in the United States from the 1980's forward, but that, going through his file boxes, he "just picked the items that [he] could fit into [a] package." *See* Trial Tr. Day 1 at 30:4–31:13.[8]

---

[7] Mr. Maduka testified that he received an award for his success in exporting his products to Nigeria in 1986. *See* Trial Tr. Day 1 at 21:3–13. However, Mr. Maduka did not specify whether his award was related to his DUDU OSUN or DUDU OSUM products. Moreover, because the Court is concerned with whether Mr. Maduka made continuous use of the marks in *United States* commerce, an *exporting* award does not win the day for him.

[8] This may be so, but the Court can only potentially credit as evidence those invoices which Mr. Maduka produced in discovery and presented to the Court during trial.

12

61.     The Court also notes that this case started in February 2017, and over the ensuing years the Court granted Mr. Maduka multiple extensions of time due to his change of counsel, and the Court even allowed his substitute counsel some limited discovery after the discovery completion deadline so he could obtain additional documents. In short, Mr. Maduka had an extended opportunity to gather and present his evidence.

62.     Beginning around 2012, Mr. Maduka's son, Agu Maduka, has sold Mr. Maduka's DUDU OSUN and DUDU OSUM products online at duduosum.com. *See* Stipulations of Fact at ¶¶ 13–14.

63.     Although Mr. Maduka does not manage duduosum.com, he gives his son—and his son's business partners—"guidelines" on how to manage Mr. Maduka's products and how to run the website. *See* Trial Tr. Day 1 at 73:1–9.

64.     He also gives his son and his son's partners "instructions on how to protect [his purported] trademark." *See id.* at 74:24–25.

65.     Mr. Maduka testified that his son and his son's partners are contractually obligated to follow Mr. Maduka's instructions. *See id.* at 75:5–11.

66.     Mr. Maduka's son and his son's partners also sell Tropical's DUDU OSUN branded African black soap on the duduosum.com website. *See id.* at 73:10–74:13; Ex. D-9B.

### 3. Mr. Maduka's Relabeling of his Products

67.     Mr. Maduka testified that he sometimes relabels his products by affixing label stickers over pre-existing packaging. *See* Trial Tr. Day 1 at 58:3–16.

68.     Mr. Maduka explained that he has labels that are pre-printed with the DUDU OSUN mark, and that he also has blank labels that he can use to apply a different mark, like the Apure mark. *See id.* at 60:5–9.

13

69.     Mr. Maduka and his staff can print these labels in-house using a color printer. *See id.* at 62:9–11.

70.     Which label Mr. Maduka affixes to his products often depends on what a specific customer wants. *See id.* at 59:14–17.

### 4.  Mr. Maduka's Trademark Applications and Registrations

71.     Mr. Maduka applied for a United States trademark registration for the DUDU OSUM mark on June 3, 2005. *See* Stipulations of Fact at ¶ 11.

72.     On his application for the DUDU OSUM mark, Mr. Maduka stated that he was using DUDU OSUM in connection with body care products, including face and body shampoo, lotions, creams, oils, body balm, facial cleanser, moisturizer, eye gel, eye makeup remover, alpha hydroxyl acid toners, and conditioner. *See id.* at ¶ 10.

73.     On his application for the DUDU OSUM mark, Mr. Maduka stated that he first used DUDU OSUM in United States commerce in January 2005. *See id.* at ¶ 12.

74.     The U.S. Patent and Trademark Office ("PTO") issued a registration to Mr. Maduka for the DUDU OSUM mark on July 4, 2006. *See id.* at ¶ 11.

75.     Mr. Maduka testified that he has used the DUDU OSUM mark continuously in United States commerce from 2005 through the present. *See* Trial Tr. Day 3 at 52:8–12.

76.     Mr. Maduka filed an application for a United States trademark registration for the DUDU OSUN mark in 2016. *See* Trial Tr. Day 1 at 21:19–22. Tropical opposed Mr. Maduka's application for the DUD OSUN mark, and that application is still pending with the PTO. *See id.* at 22:1–10.

## III. The Parties' Dispute

77.     Mr. Maduka testified that sometime after 2010, he discovered that a competitor was using the DUDU OSUN mark in connection with the sale of African black soap. *See* Trial Tr. Day 1 at 33:8–34:12.

78.     Thereafter, Mr. Maduka claims that he engaged in what he called "investigative purchasing" by buying the allegedly infringing DUDU OSUN soap from one of his distributors. *See id.* at 34:13–23.[9]

79.     Mr. Maduka testified that he discovered that Tropical was the company using the DUDU OSUN mark, and he sent Tropical a cease and desist letter in August 2013. *See id.* at 34:24–37:21; Ex. P-7.

80.     Mr. Maduka did not receive a response to his letter. *See* Trial Tr. Day 1 at 37:25–38:1.

81.     Nearly two years later, in August 2015, Ignatius Chibututu, Tropical's lawyer at the time, sent Mr. Maduka an email, asking whether Mr. Maduka would be willing to sell or assign the DUDU OSUM mark to Tropical. *See* Trial Tr. Day 1 at 40:22– 41:2; Ex. P-3 at MDK-0005.

82.     Mr. Maduka informed Mr. Chibututu that he would not sell or assign the DUDU OSUM mark, but that he would consider licensing it to Tropical. *See* Trial Tr. Day 1 at 41:5–8; Ex. P-3 at MDK-0005.

---

[9]     During cross-examination, Mr. Maduka admitted to purchasing over 44,000 bars of Tropical's soap during his "investigative purchasing." *See* Trial Tr. Day 1 at 79:6–13. Despite this heavy volume of purchases, Mr. Maduka maintained that he made these purchases only to "protect [his purported] trademark." *Id.* The Court questions Mr. Maduka's justification for purchasing such a heavy volume of Tropical's soap, especially given that Mr. Maduka allowed his son to re-sell Tropical's DUDU OSUN soap on the duduosum.com website. This is another issue that casts Mr. Maduka's credibility in doubt.

15

83.     Thereafter, Mr. Maduka traveled to Nigeria to meet with Mr. Ogunrinde to discuss the possibility of Tropical and Mr. Maduka working together. Trial Tr. Day 1 at 41:9–20.[10]

84.     After Mr. Maduka returned to the United States, he sent Mr. Ogunrinde a written proposal, explaining how Tropical could benefit from working with Mr. Maduka. *See* Trial Tr. Day 1 at 65:3–69:24; Ex. D-32.

85.     In this proposal, Mr. Maduka referred to DUDU OSUN as Tropical's brand. *See* Ex. D-32 at Tropical-0030.

86.     The parties did not agree on terms, and, in April 2017, Mr. Maduka filed this lawsuit against Tropical, asserting, among other claims, trademark infringement and unfair competition.

87.     Tropical responded with counterclaims for trademark infringement and unfair competition.

## CONCLUSIONS OF LAW

On the basis of the Court's assessment of the credibility of the witnesses, the consistency (or lack thereof) of the testimonial and documentary evidence, and the precedential case law, the Court reaches nine primary, determinative conclusions of law:

(1) DUDU OSUN and DUDU OSUM are valid and legally protectable trademarks;

(2) Tropical, not Mr. Maduka, is the owner of the DUDU OSUN trademark;

(3) Tropical's ownership of the DUDU OSUN trademark predated any legally cognizable use in commerce by Mr. Maduka of the DUDU OSUM mark;

(4) Because, as the parties stipulated, the DUDU OSUM mark is confusingly similar to the DUDU OSUN mark, Tropical's prior ownership of the DUDU OSUN mark prevents Mr. Maduka from acquiring ownership rights in the DUDU OSUM mark;

(5) Tropical is entitled to a permanent and nationwide injunction restraining Mr. Maduka, his agents, and his employees from any use of either the DUDU OSUN or DUDU

---

[10]     Mr. Maduka and Mr. Ogunrinde offered vastly different accounts of what happened when the parties met in Nigeria, but for the Court's purposes, the details of that meeting are not important. *Compare* Trial Tr. Day 1 at 86:6–87:14 with Trial Tr. Day 2 at 95:13–98:1.

OSUM mark, or of any confusingly similar mark, in connection with the sale of African black soap or other body care products;

(6) Tropical is not entitled to a disgorgement of profits;

(7) Tropical is entitled to attorneys' fees;

(8) The Court will issue an order for the cancellation of Mr. Maduka's DUDU OSUM registration; and

(9) The Court will not order cancellation of Mr. Maduka's DUDU OSUN application.

## I.    Trademark Infringement and Unfair Competition Claims

1.      The same standards apply to federal trademark infringement, federal unfair competition, and Pennsylvania common law unfair competition claims. *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards.") (citation omitted); *Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 2d 402, 431 (E.D. Pa. 2009) ("[I]n light of the many analytically identical cases . . . that use the Lanham Act in coming to a decision, this Court will use the Lanham Act in considering Plaintiffs' common law unfair competition claim against [Defendant].").

2.      To prevail on these claims, a plaintiff must establish that "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A&H Sportswear, Inc.*, 237 F.3d at 210 (citing *Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000)).

## A. Validity and Legal Protectability

3.    If the mark at issue is federally registered and has become incontestable,[11] then validity and legal protectability are proved. *See Commerce Nat'l Ins. Servs.*, 214 F.3d at 438.

4.    If the mark at issue has not been federally registered or, if registered, has not achieved incontestability status, then "'validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive.'" *Id.* (quoting *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir. 1991)).

5.    A mark is inherently distinctive if it "may be fairly characterized as arbitrary, fanciful, or suggestive." *Id.* at 438 n.5 (citing *Ford Motor Co.*, 930 F.2d at 292 n.18).

6.    A mark is "arbitrary" or "fanciful" if it "bear[s] no logical or suggestive relation to the characteristics of the goods," i.e., it uses terms that "neither describe nor suggest anything about the product." *A&H Sportswear, Inc.*, 237 F.3d at 221 (citation and quotations omitted).

7.    A mark is "suggestive" if it "requires consumer imagination, thought, or perception to determine what the product is." *Id.* at 221–22 (citation and quotations omitted).

8.    On the other hand, a mark is "descriptive" if it "convey[s] an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* (citation and quotations omitted).

9.    "If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness." McCarthy on Trademarks and Unfair Competition § 11:67 (5th ed.).

10.    "Under the doctrine of foreign equivalents, foreign words from common languages are translated into English to determine whether they are generic or descriptive." *Taza Sys., LLC*

---

[11]    Five years after registering a mark, the holder may file an affidavit and have its mark declared "incontestable," which entitles the holder to additional protections. *See* 15 U.S.C. § 1065(3).

*v. Taza 21 Co., LLC*, No. 11-73, 2013 U.S. Dist. LEXIS 130974, at *30–31 (W.D. Pa. Sept. 13, 2013) (citing *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1377 (Fed. Cir. 2005)). This doctrine "prevents a word commonly used in another language to 'designate a product as what it is' from being transformed into a trademark in the United States, which can only be used by one owner." *Id.* at *31 (quoting *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 271 (2d Cir. 1999) and McCarthy on Trademarks and Unfair Competition § 12:41 (4th ed.)).

11.    However, the doctrine of foreign equivalents "applies only if 'the ordinary American purchaser' would 'stop and translate' the mark into English." *Id.* (citing *In re Spirits Int'l, N.V.*, 563 F.3d 1347, 1351–52 (Fed. Cir. 2009)).

12.    If a mark is "arbitrary," "fanciful," or "suggestive," it "is automatically considered distinctive and will be protected." *Strike Holdings LLC v. UC Strikes, LLC*, No. 05-1023, 2005 U.S. Dist. LEXIS 15398, at *9–10 (E.D. Pa. July 28, 2005) (citing *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986)).

13.    If a mark is "descriptive," it can get trademark protection, but only with proof that the mark has achieved some "secondary meaning." *See A.J. Canfield Co.*, 808 F.2d at 297.

14.    A mark has secondary meaning when it "is interpreted by the consuming public to be not only an identification of certain products or services, but also a representation of the origin of those products or services." *Commerce Nat'l Ins. Servs.*, 214 F.3d at 438 (citation and quotations omitted).

### 1.  Validity and Legal Protectability of the DUDU OSUN Mark

15.    Neither party has a federal registration for the DUDU OSUN mark.

16.     Therefore, the DUDU OSUN mark is valid and legally protectable only if it is an "arbitrary," "fanciful," or "suggestive" mark, or if it has "secondary meaning."

17.     The Court concludes that the DUDU OSUN mark is "suggestive," and thus, that it is valid and legally protectable.

18.     Tropical and Mr. Maduka both use DUDU OSUN in connection with African black soap. And Mr. Maduka uses DUDU OSUN in connection with additional body care products.

19.     Messrs. Ogunrinde and Maduka both testified that the word "dudu" in Yoruba translates to "black" in English. *See* Trial Tr. Day 2 at 50:2–3; Trial Tr. Day 1 at 43:5–9.

20.     Mr. Maduka further testified that in Nigerian "street language" or "slang," "dudu" translates to "funky" in English. *See* Trial Tr. Day 1 at 44:13–45:20.

21.     Messrs. Ogunrinde and Maduka both testified that the word "osun" in Yoruba translates to "camwood" in English. *See* Trial Tr. Day 2 at 50:4–5; Trial Tr. Day 1 at 43:10–16.

22.     Thus, translated from Yoruba into English, DUDU OSUN means either "black camwood" or "funky camwood."

23.     Tropical uses camwood as one of several ingredients in its black soap. *See* Trial Tr. Day 2 at 47:12–48:3; Ex. D-34. Other ingredients include palm kernel oil, coca pod ash, palm ash, shea butter, water, honey, lime juice, aloe vera, and lemon juice. *See* Ex. D-34.

24.     Although the DUDU OSUN mark is somewhat descriptive in that it identifies one of the many ingredients in the parties' black soap and the fact that the product is black, the Court concludes that the DUDU OSUN mark does not fully describe the goods or services it represents.

25.     There is nothing in the mark itself that is associated with soap,[12] and the consumer must employ his or her imagination or perception to determine that "dudu" ("black" or "funky")

---

[12]    Mr. Ogunrinde testified that "soap" in English translates to "ose" in Yoruba. *See* Trial Tr. Day 2 at 48:17–18.

20

and "osun" ("camwood") are associated with African black soap, and not used in the many other contexts in which this combination of words might be found. *See Strike Holdings LLC*, 2005 U.S. Dist. LEXIS 15398, at *10 ("[T]he consumer must employ his or her imagination or perception to determine that 'strike,' in this instance, is associated with bowling, and not used in the myriad of other contexts in which the word might be found. Moreover, other than the word 'strike,' there is nothing in the mark itself connected to bowling. Consequently, the mark is inherently distinctive and therefore constitutes a valid and legally protectable mark.").

26.     Therefore, even assuming that the ordinary American purchaser would (or could) stop and translate DUDU OSUN into English, which is highly unlikely, the Court concludes that the DUDU OSUN mark is inherently distinctive and constitutes a valid and legally protectable mark.[13]

## 2. Validity and Legal Protectability of the DUDU OSUM Mark

27.     Although Mr. Maduka has a federal registration for the DUDU OSUM mark, there is no evidence suggesting that Mr. Maduka filed an affidavit as required by 15 U.S.C. § 1065(3) to have his registration designated "incontestable."

28.     Therefore, the DUDU OSUM mark is valid and legally protectable only if it is an "arbitrary," "fanciful," or "suggestive" mark, or if it has "secondary meaning."

29.     The Court concludes that DUDU OSUM is, at the very least, a "suggestive," and thus a valid and legally protectable mark, for the same reasons that it concluded that DUDU OSUN is a valid and legally protectable mark.[14]

---

[13]     Because the Court concludes that the DUDU OSUN mark is inherently distinctive, it need not address the question of secondary meaning. *See Strike Holdings LLC*, 2005 U.S. Dist. LEXIS 15398, at *10–11.

[14]     If anything, because the word "osum" does not describe Mr. Maduka's products or their ingredients in any way and was instead chosen because Mr. Maduka believed it conveyed that his

21

## B. Ownership

30.     Under the Lanham Act, a federally registered trademark is "prima facie evidence of the . . . the registrant's ownership of the mark [and] of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115(a).

31.     However, rights to a trademark are based on who was the first continuous user of the mark in United States commerce, not the first to register it. *See* 15 U.S.C. § 1057(c) (noting that a registered mark is not enforceable against a senior-in-time user); *Allard Enters. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 356 (6th Cir. 1998) ("One of the bedrock principles of trademark law is that trademark . . . ownership is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and actual use in the market.") (citation and quotations omitted); *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1125 (9th Cir. 2006) ("To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services.") (citation and quotations omitted); *Warren Publ'g Co.*, 645 F. Supp. 2d at 433 ("Neither application for nor registration of a mark at the federal level wipes out the prior nonregistered, common law rights of others.") (citation and quotations omitted).

32.     Therefore, "in a priority dispute between a senior common law user and a second-in-time [registrant], the senior common law user will prevail." *Warren Publ'g Co.*, 645 F. Supp. 2d at 433 (citation and quotations omitted); *see also Lucent Info. Mgmt. v. Lucent Techs., Inc.*, 186

---

products are "awesome," *see* Trial Tr. Day 1 at 45:21–25, the DUDU OSUM mark is more distinctive than the DUDU OSUN mark.

22

F.3d 311, 315 (3d Cir. 1999) ("Because [the registrant] filed its [intent to use application with the PTO] on November 30, 1995, [the registrant] has priority over anyone using the mark after that date *unless the person earlier used the mark.*") (emphasis added) (citations omitted).

33.     The party claiming that it established ownership rights prior to the opposing party's federal registration bears the burden of showing their prior appropriation and a continued use of the mark in commerce by a preponderance of the evidence. *See Allard Enters.*, 146 F.3d at 356–57 (citations omitted); *Warren Publ'g Co.*, 645 F. Supp. 2d at 433 ("'[T]he registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration, and the challenger must overcome this presumption by a preponderance of the evidence.'") (quoting *Dallas Cowboys Football Club, Ltd v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 632–33 (N.D. Tex. 2009)).

34.     The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.

35.     A party asserting common law use rights can prevail only if it shows prior use of the mark "'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Lucent Info. Mgmt.*, 186 F.3d at 315 (quoting *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1266 (5th Cir. 1975)). In other words, that party "must introduce evidence to show its trademark has achieved market penetration that is significant enough to pose the real likelihood of confusion among the consumers in that area." *Id.* at 317 (citation and quotations omitted).

36.     Courts in this circuit consider four factors "to determine whether the market penetration of a trademark in an area is sufficient to warrant protection: (1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the

number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." *Id.* (citing *Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398–99 (3d Cir. 1985)).

37.     "[S]ales volume must be more than *de minimis*." *Id.* at 317–18 (finding a document imaging and management services company's use of a trademark was *de minimis* because it made a single sale for $323.50 in a year); *Natural Footwear, Ltd.*, 760 F.2d at 1400 (finding a clothing store's use of a trademark was *de minimis* because it achieved "neither gross sales of over $5,000 nor a total of over 50 customers" in two of the three years for which sales data was available).

38.     As long as there is "genuine use of the mark in commerce, however, ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition." *Allard Enters.*, 146 F.3d at 358.

39.     In fact, even a single sale or shipment could be sufficient to establish ownership of the trademark if the sale or shipment was followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market in a commercial scale. *See Lucent Info. Mgmt.*, 186 F.3d at 317 (citing *Blue Bell, Inc.*, 508 F.2d at 1265); *Bazaar Del Mundo, Inc.*, 448 F.3d at 1126 (9th Cir. 2006) (citing cases); *Allard Enters.*, 146 F.3d at 358–59 (citing cases); *Hershey Co. v. Promotion in Motion, Inc.*, No. 07-1601, 2010 U.S. Dist. LEXIS 152868, at *41–45 (D.N.J. Oct. 4, 2010) (denying summary judgment in a trademark case because there was a genuine dispute of fact as to whether the defendant's single sale of fifty boxes of chocolate, when considered in light of the defendant's subsequent marketing efforts, constituted a bona fide use of the disputed trademark).

24

40.     For example, in *Allard Enters.*, the parties' dispute centered on who was the first to use a mark containing the acronym "APR" in connection with recruiting services. 146 F.3d at 351–52.

41.     Although the plaintiff registered the mark "APR OF OHIO" with the Secretary of the State of Ohio on January 20, 1994 and first used the mark on March 30, 1994, the court held that the defendants owned the mark because they used the mark in commerce prior to March 30, 1994. *Id.* at 359–60.

42.     To support its conclusion, the court highlighted that the defendants had included the mark "on at least one fax, on at least one resume, and in numerous other solicitations, as they offered [their] services to several employers doing business in Ohio."[15] *Id.* at 359.

43.     The court explained that "the use of a mark 'need not have gained wide public recognition' to establish priority, and that the defendants' use of the mark was "sufficiently public to qualify for protection," because there was evidence that several companies that did business in Ohio identified the APR mark with the defendants and their services. *Id.* (quoting *Blue Bell, Inc.*, 508 F.2d at 1265).

44.     Finally, although it was "limited" and "not high-volume," the court found that the defendants' use of the mark was "continuous" because it was "part of an ongoing program to exploit the mark commercially." *Id.* (citing *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir. 1974)).

45.     "When a manufacturing seller normally distributes to retailers and not to consumers, the first bona fide sale to a retailer establishe[s] priority on the theory that there is

---

[15]     Although the court used the word "numerous," the record contained evidence that the defendants assisted five individuals in their job searches and solicited approximately ten employers from 1991 through 1994. *See Allard Enters.*, 146 F.3d at 353–54.

25

nothing in the law which requires that priority must be determined by who sells to the consumer first." McCarthy on Trademarks and Unfair Competition § 16:5 (5th ed.) (citing *Blue Bell, Inc.*, 508 F.2d at 1267 (priority was determined by which manufacturer was first to sell apparel to retailers)).

46. "'It is well settled that foreign use is ineffectual to create trademark rights in the United States.'" *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 559 (5th Cir. 1985) (quoting *Las Societe Anonyme des Parfums Le Galion*, 495 F.2d 1270 n.4)); *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 714 (3d Cir. 2004) (citing *Fuji Photo Film Co., Inc.*, 754 F.2d at 599, for the proposition that it is "error to admit evidence of the parties' foreign trademark practices"); McCarthy on Trademarks and Unfair Competition § 29:2 (5th ed.) ("Priority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world.").

## 1. Ownership of the DUDU OSUN Mark

47. Tropical successfully carried its burden of proving, by a preponderance of the evidence, that it has priority over the DUDU OSUN mark because, as between it and Mr. Maduka, Tropical was the first to make bona fide and continuous use of the DUDU OSUN mark in United States commerce.

48. As discussed in the Findings of Fact, Tropical's earliest proof of its use of the DUDU OSUN mark in United States commerce in connection with the sale of its African black soap is an invoice of sale dated December 14, 2001. *See* Ex. D-17A. This invoice reflects the shipment of one hundred cartons—4,800 bars—of Tropical's DUDU OSUN soap to International Beauty Care Company, a distributor in California. *See supra* Findings of Fact ¶ 18.

49. This first sale was more than *de minimis*. *Cf. Lucent Info. Mgmt.*, 186 F.3d at 317 (finding a document imaging and management services company's use of a trademark was *de minimis* because it made a single sale for $323.50 in a year); *Natural Footwear, Ltd.*, 760 F.2d at 1400 (finding a clothing store's use of a trademark was *de minimis* because it achieved "neither gross sales of over $5,000 nor a total of over 50 customers" in two of the three years for which sales data was available).

50. Tropical's next documented sale is from May 8, 2002. *See* Ex. D-17B. That invoice reflects a sale of 48,000 bars of soap to a distributor in Virginia for $28,479.00. *See id.*

51. Even if the December 2001 single sale did not exceed a *de minimis* threshold, the May 8, 2002 sale certainly did.

52. The parties also stipulated to the admissibility of a series of invoices and packing slips evidencing sales of Tropical's DUDU OSUN soap made by International Beauty Care Company to several other distributors in the United States, dated December 14, 2001, and then more from February 2008 through April 2016. *See* Exs. D-2A through Y, D-4A and B, and D-17A.

53. Specifically, the parties stipulated that International Beauty Care Company "has been distributing Dudu-Osun, Nancy, branded soap *throughout the United States* as manufactured by Cosmos Chemicals and later by Tropical Naturals at least on or around the dates reflected upon" the referenced exhibits. Trial Tr. Day 3 at 29:23–30:7 (emphasis added).

54. The invoices and packing slips referenced in that stipulation show the sale of over 150,000 bars of Tropical's DUDU OSUN soap in the United States between 2001 and 2016.

55. Stipulations are, of course, binding on the parties. *See Std. Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) ("Stipulations must be binding.") (citation omitted).

56.     Tropical also presented information from Deloitte, its outside auditor, that, from December 2013 through the end of 2017, Tropical had $218,090.00 worth of direct sales of DUDU OSUN soap to International Beauty Care Company and Tourays Cosmetics, LLC, another distributor in the United States. *See* Trial Tr. Day 2 at 28:18–30:7; Ex. P-8.

57.     And Mr. Ogunrinde testified—and submitted a sworn declaration stating—that Tropical's sales of DUDU OSUN soap in the United States for 2018 through February 2019 were approximately $802,575.00. *See* Trial Tr. Day 2 at 30:8–31:7.

58.     Tropical has demonstrated a sufficient volume of sales and continuous growth to demonstrate its bona fides.

59.     Although Tropical did not present actual invoices evidencing sales in the United States between May 2002 and February 2008, it presented other evidence of sales and continued use of the DUDU OSUN mark in United States commerce during those years.

60.     For example, Dr. Churchill Idah, who operates International Beauty Care Company, testified that he has been importing DUDU OSUN soap manufactured by Tropical for sale in the United States continuously from 2001 through the present. *See* Trial Tr. Day 3 at 35:4– 11. He further testified that he has sold Tropical's DUDU OSUN soap to distributors nationwide, *see id.* at 35:12–36:14, who then sell the soap to retailers, who in turn sell the soap to consumers. *See id.* at 36:23–37:1.

61.     Tropical's DUDU OSUN soap was also advertised in the United States in the Africa Imports catalog in, at least, the Fall/Winter 2002, Summer 2004, Spring 2009, and Spring 2011 editions. *See* Trial Tr. Day 2 at 69:2–71:15; Ex. D-1A through D.  The Africa Imports catalog was distributed "all over the United States." *See* Trial Tr. Day 2 at 69:20–22.

28

62. Finally, Mr. Ogunrinde testified that he received several letters from U.S. customers who expressed their appreciation for Tropical's DUDU OSUN soap or their desire to purchase more of the product. *See* Trial Tr. Day 2 at 77:14–85:10. The following correspondence was admitted into evidence:

    i. An August 2002 letter from a customer in Kansas, *see* Ex. D-14E;

    ii. An August 2003 e-mail from a customer in Delaware, *see* Ex. D-14D;

    iii. A February 2004 letter from a customer in Florida, *see* Ex. D-14A;

    iv. An April 2004 letter from a customer in Ohio, *see* Ex. D-14B;

    v. A July 2005 letter from a customer in New York, *see* Ex. D-14C;

    vi. A September 2005 letter from a customer in Pennsylvania, *see* Ex. D-14F; and

    vii. A January 2007 letter from a customer in California. *See* Ex. D-13B.[16]

63. In light of this evidence, and the factors set out by the Third Circuit Court of Appeals in *National Footwear, Ltd*, 760 F.2d at 1398–99, including volume of sales, growth trends, and advertising,[17] the Court concludes that Tropical established its priority of use as of December 14, 2001 in the United States.

64. After that time, Tropical's use of the mark was continuous and "part of an ongoing program to exploit the mark commercially." *Allard Enters.*, 146 F.3d at 359 (finding that the

---

[16] Mr. Maduka did not challenge these letters on hearsay grounds or otherwise object to their admissibility. *See* Trial Tr. Day 2 at 82:16–24, 85:5–10. But even if Mr. Maduka did preserve a hearsay objection, it would fail because Tropical offered the letters to prove that consumers across the United States recognized Tropical's use of the DUDU OSUN mark, not to prove the truth of the matter asserted in the letters, i.e., that the authors of the letters were actually satisfied with Tropical's soap or wanted to purchase more. *United States v. Greenspan*, 923 F.3d 138, 148 (3d Cir. 2019) ("A statement is not hearsay unless a party 'offers [it] in evidence to prove the truth of the matter asserted.'") (quoting Fed. R. Evid. 801(c)(2)).

[17] Neither Tropical nor Mr. Maduka presented evidence that would allow the Court to consider the third *National Footwear* factor, the number of persons actually purchasing the product in relation to the potential number of customers.

29

defendants established priority rights because they included the disputed mark "on at least one fax, on at least one resume, and in numerous other solicitations" made to potential customers before the plaintiff used the mark, and because several companies doing business in the region identified the disputed mark with the defendants' services).

65. Based on the parties' stipulation that International Beauty Care Company was selling Tropical's DUDU OSUN soap "throughout the United States" since 2001, Dr. Idah's testimony that he has been selling Tropical's DUDU OSUN soap nationwide since, at least, 2001, Tropical's use of nationwide catalogs to advertise its products, and the letters demonstrating recognition of Tropical's DUDU OSUN soap in diverse geographic regions across the country, the Court concludes that Tropical's market penetration, and, thus, its rights to the DUDU OSUN mark, extended nationwide. *See Watec Co. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005) (finding a jury reasonably granted nationwide priority to a non-registrant where it relied on, among other things, letters from consumers spread out across the United States requesting price quotes and the testimony of a distributor who claimed to have purchased and re-sold the non-registrant's products throughout the United States).

66. Although Mr. Maduka testified that he used the DUDU OSUN mark in United States commerce continuously since 1986, the Court cannot find his testimony on this, and a number of other important issues, credible.

67. Mr. Maduka's only evidence of sales in 1986 were two barely partially legible photographs of invoices. *See* Ex. P-6 at MDK-0009, MDK-0108.

68. As discussed in the Findings of Fact, only one of the invoices from 1986 used the name "Dudu Osun" to identify Mr. Maduka's black soap. *See id.* at MDK-0108. The other invoice

30

from 1986 identified his black soap as "Apure Dudu Black Soap," not "Dudu Osun." *See id.* at MDK-0009.

69.     And even considering all of the products identified only as "Dudu," the two invoices from 1986 account for only $72 worth of sales. *See id.* at MDK-0009; MDK-0108.

70.     Therefore, even if the Court credited these invoices—which it does not—Mr. Maduka's use of the DUDU OSUN mark in 1986 was the very definition of *de minimis*. *Lucent Info. Mgmt.*, 186 F.3d at 317; *Natural Footwear, Ltd.*, 760 F.2d at 1400.

71.     After the 1986 invoices, the earliest invoice that Mr. Maduka presented into evidence is from December 2000. *See id.* at MDK-0212; Trial Tr. Day 1 at 84:5–21.[18]

72.     Mr. Maduka then produced two invoices from 2001. *See* Ex. P-6 at MDK-0059, MDK-0220.[19]

73.     Even considering all of the products identified with just the word "Dudu," the three invoices from 2000 and 2001 account for only $2,089.26 worth of sales.

74.     Therefore, the Court finds that Mr. Maduka's use of the DUDU OSUN mark in 2000 and 2001 was merely *de minimis*. *See Lucent Info. Mgmt.*, 186 F.3d at 317; *Natural Footwear, Ltd.*, 760 F.2d at 1400.

---

[18]     Again, this invoice does not identify Mr. Maduka's black soap as "Dudu Osun." Rather, it identifies his black soap as "Dudu Raw Africa Black Soap," "Apure Dudu Raw Black Soap (Balls)," and "APure Dudu Liquid Black Soap." *See* Ex. P-6 at MDK-0212.

[19]     Like the 2000 invoice, one of the 2001 invoices did not identify Mr. Maduka's black soap as "Dudu Osun." It identified his black soap as "APure Dudu Black soap" and "APure Dudu Liquid Black soap." *See* Ex. P-6 at MDK-0059.

75.     Mr. Maduka could not demonstrate any other use of the DUDU OSUN mark until April 3, 2010, well after Tropical had established its nationwide priority over the DUDU OSUN mark. *See* Ex. P-6 at MDK-0199.[20]

76.     Therefore, the Court concludes that, as between Tropical and Mr. Maduka, Tropical established ownership of the DUDU OSUN mark, and Tropical has nationwide priority over the DUDU OSUN mark.

### 2. Ownership of the DUDU OSUM Mark

77.     Although a federally registered trademark is "prima facie evidence of the . . . registrant's ownership of the mark [and] of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration," 15 U.S.C. § 1115(a), "in a priority dispute between a senior common law user and a second-in-time [registrant], the senior common law user will prevail." *Warren Publ'g Co.*, 645 F. Supp. 2d at 433 (citation and quotations omitted); *see also Lucent Info. Mgmt.*, 186 F.3d at 315 ("Because [the defendant] filed its [intent to use application with the PTO] on November 30, 1995, [the

---

[20]     The Court concludes that, even if Mr. Maduka's use of the DUDU OSUN mark in 2000 and 2001 was not *de minimis*, and he gained ownership of the DUDU OSUN mark at that time, Mr. Maduka abandoned the mark by not making use of it again until April 2010. A trademark is considered abandoned—and thus, not enforceable against any junior user—if its use has been discontinued with an intent not to resume use. 15 U.S.C. § 1127. Although Tropical would ordinarily have the burden of proving Mr. Maduka's intent to abandon, three consecutive years of non-use of a mark by the alleged owner is *prima facie* evidence of abandonment. *See Marshak v. Tredwell*, 240 F.3d 184, 198–99 (3d Cir. 2001). After establishing a *prima facie* case, the burden shifts to the alleged owner to come forward with evidence that it "intended to resume use of the mark within a reasonably foreseeable time." *Warren Publ. Co.*, 645 F. Supp. 2d at 436. As discussed above, apart from Mr. Maduka's testimony, there is no evidence that Mr. Maduka used the DUDU OSUN mark between 2001 and April 2010. This lack of use significantly exceeded three years, and Mr. Maduka failed to present any actual evidence that he intended to resume use of the mark within a reasonably foreseeable time. Thus, Tropical had until at least April 2010 to establish common law usage rights, and with the benefit of the 2008 and 2009 invoices, *see* Exs. D-2 V and W, Tropical's claim to national priority is even stronger.

defendant] has priority over anyone using the mark after that date *unless the person earlier used the mark*.") (emphasis added) (citations omitted).

78.     "The PTO may not issue registration for a trademark if the proposed mark 'consists of or compromises a mark which so resembles a mark registered in the [PTO], or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.'" *CFE Racing Prods. v. BMF Wheels, Inc.*, 793 F.3d 571, 594 (6th Cir. 2015) (quoting 15 U.S.C. § 1052(d)).

79.     In other words, "the PTO may not issue registered marks for logos that cause confusion with a registered *or unregistered* trademark." *Id.* (emphasis added) (citations omitted).

80.     Mr. Maduka applied for a United States trademark registration for the DUDU OSUM mark on June 3, 2005. *See* Stipulations of Fact at ¶ 11.

81.     On his application for the DUDU OSUM mark, Mr. Maduka stated that he first used DUDU OSUM in United States commerce in January 2005. *See id.* at ¶ 12.[21]

82.     The Patent and Trademark Office issued a registration to Mr. Maduka for the DUDU OSUM mark on July 4, 2006. *See id.* at ¶ 11.

83.     However, because the parties stipulated that DUDU OSUN and DUDU OSUM are confusingly similar when used in connection with African black soap and other body care products, and because, as discussed at length above, Tropical established nationwide priority over the DUDU OSUN mark in December 2001—well before Mr. Maduka claims to have first used the DUDU

---

[21]     The Court notes that one of Mr. Maduka's invoices from December 2000 reflects the sale of $15.00 worth of "Dudu Osum Raw Shea Butter CONDITIONER." *See* Ex. MDK-0212. The Court concludes that this sale is *de minimis*.

OSUM mark in January 2005—Mr. Maduka's asserted rights to the DUDU OSUM mark are invalid.[22] *See CFE Racing Prods.*, 793 F.3d at 594.[23]

## C. Likelihood of Confusion

84. The parties have stipulated that the marks DUDU OSUN and DUDU OSUM are "likely to cause consumers to be confused as to the source, sponsorship, or affiliation of goods when seeing the marks used on and in connection with soap and body care products." *See* Stipulations of Fact at ¶ 4.

85. Mr. Maduka has made use of the DUDU OSUN and DUDU OSUM marks in United States commerce in connection with soap and other body care products after Tropical acquired ownership of the DUDU OSUN mark in December 2001.

---

[22] The Court concludes that, even if Mr. Maduka's presumptive first use of the DUDU OSUM mark in January 2005 occurred before Tropical acquired common law rights to the DUDU OSUN mark (which it did not), Mr. Maduka abandoned his DUDU OSUM mark by not making use of it again until November 2009. *See* Ex. P-6 at MDK-0190. This lack of use far exceeded three years, and Mr. Maduka failed to present any actual evidence that he intended to resume use of the DUDU OSUM mark within a reasonably foreseeable time. Thus, Tropical had until at least November 2009 to establish common law usage rights, and with the benefit of the 2008 and 2009 invoices, *see* Exs. D-2 V and W, Tropical's claim to ownership of the DUDU OSUN mark is, once again, even stronger.

[23] Mr. Maduka argues that Tropical conceded ownership of the DUDU OSUM mark when its lawyer, Mr. Chibututu, offered to buy the DUDU OSUM mark from Mr. Maduka in August 2015. In response, Tropical argues that the email from Mr. Chibututu should be excluded from evidence pursuant to Federal Rule of Evidence 408 because it is part of a settlement discussion. The Court need reach a decision on the Rule 408 question, however, because the Court is not persuaded that Mr. Chibututu's email constitutes a concession of ownership. There are several reasons why one party may seek to buy another party's trademark, even if it believes it is lawfully entitled to use the mark (or a confusingly similar mark), including the desire to avoid the costs and risks associated with litigation. Furthermore, if the Court were to consider Mr. Chibututu's August 2015 email, it would also have to consider the proposal Mr. Maduka sent to Mr. Ogunrinde following their meeting in Nigeria, from which one may arguably infer that Mr. Maduka conceded ownership of the DUDU OSUN mark when he referred to it as Tropical's brand. Ultimately, the Court concludes that neither of these emails is determinative of the question of ownership.

34

86. Therefore, the Court need not address this element any further.[24]

**D. Laches**

87. Mr. Maduka raised the affirmative defense of laches in his answer to Tropical's counterclaims. *See* Mr. Maduka's Answer at 8, ¶ 4.

88. However, Mr. Maduka did not assert laches as a potential defense in his proposed findings of fact and conclusions of law. *See* Mr. Maduka's Proposed Findings of Fact and Conclusions of Law.

89. Therefore, Mr. Maduka has waived his right to invoke an equitable argument based on laches. *See Jhi Pai Chen-Zhu v. AG of the United States*, 414 F. App'x 495, 498 (3d Cir. 2011) ("[I]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (citation and quotations omitted).

90. Nevertheless, the Court concludes that Mr. Maduka is not entitled to invoke laches.

91. Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." *Santana Prods. v. Bobrick Washroom Equip.*, 401 F.3d 123, 138 (3d Cir. 2005).

92. "Once the statute of limitations has expired, the defendant enjoys the benefit of a presumption of inexcusable delay and prejudice." *Id.* (citation and quotations omitted).

93. Because the Lanham Act does not have its own statute of limitations, federal courts applying it borrow from the most applicable statue of limitations under the law of the forum state.

---

[24] The Court notes that the marks are so obviously confusingly similar that, in an effort to avoid confusion and aid the court reporter in preparing a clear transcript, for the trial the Court needed to direct counsel and the witnesses to use the designations "Nancy" and "Mary" when orally referring to DUDU OSU<u>N</u> and DUDU OSU<u>M</u>, respectively. *See* Trial Tr. Day 1 at 5:20–6:19; *see also supra* note 1.

In Pennsylvania, federal courts borrow from the Pennsylvania Unfair Trade Practices and Consumer Protection Law, which has a six-years statute of limitations. *See id.* at 137; *Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509, 517 (E.D. Pa. 2007).

94. The Court concludes that Tropical first learned of Mr. Maduka's use of the DUDU OSUN and DUDU OSUM marks in August 2013 (when Mr. Maduka sent his cease and desist letter).

95. Tropical first commenced opposition and cancellation proceedings against Mr. Maduka with the PTO in 2016, which was less than six years from when Mr. Maduka sent his cease and desist letter.

96. Therefore, Mr. Maduka does not benefit from a presumption of inexcusable delay or prejudice, and he bears the burden of establishing both elements.

97. The Court concludes that this three-year period was not an unreasonable delay by Tropical, especially given that the parties engaged in face-to-face negotiations concerning the disputed marks in Nigeria in 2015.

98. Even if Tropical did delay in enforcing its rights, the Court finds that Mr. Maduka was not prejudiced because he presented no evidence that he made any financial investments in expanding his use of either the DUDU OSUN or the DUDU OSUM marks between 2013 and 2016.

99. Furthermore, because Mr. Maduka admits to relabeling products by placing stickers over existing packaging, Mr. Maduka would be able to resell any existing inventory by placing a non-infringing label over an infringing label.

100. For these reasons, the Court finds in favor of Tropical on Mr. Maduka's claims for trademark infringement and unfair competition against Tropical.

36

101. The Court also finds in favor of Tropical on Tropical's counterclaims for trademark infringement and unfair competition against Mr. Maduka.

## II. Remedies

102. Tropical requests several remedies, including (1) a permanent injunction; (2) a disgorgement of Mr. Maduka's profits; and (3) attorneys' fees.

### A. Permanent Injunction

103. Tropical argues that it is entitled to a nationwide injunction to restrain Mr. Maduka from using DUDU OSUN or any confusingly similar mark, including DUDU OSUM.

104. A plaintiff who seeks injunctive relief must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[25]

105. In *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, the Third Circuit Court of Appeals held that the *eBay* factors apply in Lanham Act cases. 765 F.3d 205, 214–15 (3d Cir. 2014).

106. Here, the Court concludes that the *eBay* factors weigh in favor of awarding Tropical a permanent injunction.

---

[25] The Court notes that, in his proposed findings of fact and conclusions of law, Mr. Maduka did not (1) make any arguments as to the application of the *eBay* factors in this case or (2) challenge the scope of Tropical's proposed injunction. *See* Mr. Maduka's Proposed Findings of Fact and Conclusions of Law.

107. First, Tropical has suffered an irreparable injury because Mr. Maduka has and continues to infringe upon its trademark and does so in a manner that the parties concede is likely to cause confusion among consumers.

108. In fact, Mr. Maduka's DUDU OSUN and DUDU OSUM products are sold side-by-side with Tropical's DUDU OSUN black soap on the duduosum.com website operated by Mr. Maduka's son.

109. Mr. Maduka places his infringing marks on black soap having a slightly different formulation than the black soap manufactured by Tropical, and thus, Tropical's mark is used, without its consent, on goods which deviate from the characteristics which Tropical chooses to have consumers associate with its soap. *See Game Power Headquarters, Inc. v. Owens*, 37 U.S.P.Q.2d 1427, 1433 (E.D. Pa. 1995) ("Irreparable injury includes loss of control of reputation, loss of trade, and loss of good will.") (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)).

110. Second, monetary damages are inadequate in this case because they would not sufficiently deter Mr. Maduka from engaging in future infringement and unfair competition. *See Lokai Holdings, LLC v. Barba*, No. 16-4083, 2017 U.S. Dist. LEXIS 178463, at *13 (D.N.J. Oct. 26, 2017).

111. Third, the balance of hardships favors a permanent injunction in this case because Tropical's irreparable injury can only be prevented by injunctive relief and because the hardship a permanent injunction will place on Mr. Maduka is limited given that he already uses multiple labels for his products, including the mark "Apure," and the costs associated with re-labeling his infringing products will be limited, given that Mr. Maduka can print his labels in-house.

38

112. Finally, granting an injunction in this case will further the public's interest in the protection of trademarks and prevent public confusion as to the source of goods. *See Chanel, Inc. v. Matos*, 133 F. Supp. 3d 678, 690 (D.N.J. 2015) ("'[T]he public interest is advanced by preventing the erosion of the value of [trademark] interests.'") (quoting *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 156 (3d Cir. 1984)); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010) ("[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.") (citing *SK&F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980)).

113. Because, as discussed at length above, Tropical established nationwide market penetration, the Court will restrain Mr. Maduka, and any of his agents, employees or affiliates, from using the DUDU OSUN mark, DUDU OSUM mark, or any confusingly similar variation thereof, in connection with the sale of African black soap, or other body care products, including— without limitation—soaps, shampoos, conditioners, lotions, creams, oils, body balms, facial cleansers, and moisturizers, anywhere in the United States.[26]

## B. Disgorgement of Profits

114. Tropical also asks the Court for a disgorgement of Mr. Maduka's profits resulting from his infringing use of the DUDU OSUN and DUDU OSUM marks in the last six years.

115. Disgorgement of profits is an equitable remedy that lies within the discretion of the Court. *See Merisant Co.*, 515 F. Supp. 2d at 529 (citing 15 U.S.C. § 1117(a)).

---

[26] The Court extends the scope of the injunction to cover other body care products because the parties stipulated that use of the marks DUDU OSUN or DUDU OSUM are "likely to cause consumers to be confused as to the source, sponsorship, or affiliation of goods when seeing the marks used on and in connection with soap and *body care products*." *See* Stipulation of Facts at § 4 (emphasis added).

116. The Third Circuit Court of Appeals has held that, in evaluating whether equity supports disgorging the losing party's profits, a court should consider the following factors: (1) whether the defendant had the intent to confuse or deceive; (2) whether sales have been diverted; (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off. *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005) (citation and quotations omitted).

117. A plaintiff may recover the defendant's profits if (1) the defendant has been unjustly enriched, (2) the plaintiff sustained damages; or (3) disgorgement of profits is necessary to deter infringement. *Id.* at 177–78.

118. The Court concludes the equities do not favor disgorgement of profits in this case.

119. First, although there is some evidence that suggests Mr. Maduka copied Tropical's DUDU OSUN mark and its grass logo, Tropical has not demonstrated that Mr. Maduka did so with any intent to confuse or deceive.

120. Second, although Tropical has been irreparably harmed by Mr. Maduka's use of the disputed trademarks, it has not demonstrated any actual diverted sales or other readily calculable monetary damages.

121. Third, as discussed above, the permanent injunction will adequately protect Tropical from Mr. Maduka's infringement.

122. Finally, and most importantly, Tropical has not proven that Mr. Maduka actually made any profits from its use of the disputed marks.

123. Tropical argues that the few invoices Mr. Maduka presented into evidence show $29,235.02 worth of sales of DUDU OSUN or DUDU OSUM products in the last six years. *See* Tropical's Disgorgement of Profits Calculation.

124. However, during oral argument, Tropical's counsel conceded that he did not know whether Mr. Maduka made a profit and "wouldn't be surprised if [Mr. Maduka] didn't make any profit." *See* July 12, 2019 Oral Argument Tr. (Rough) at 24:10–12.

125. The Court has already questioned the credibility of Mr. Maduka's invoices, and it would be inequitable for the Court to discount Mr. Maduka's invoices during its analysis of the merits of the trademark infringement and unfair competition claims, and then credit his invoices for purpose of trying to calculate a disgorgement of profits.

126. Because it is unclear whether Mr. Maduka has been enriched and because Tropical's trademark rights will be adequately protected by the permanent injunction, the Court declines to award disgorgement of any profits in this case.

**C. Attorneys' Fees**

127. Tropical also asks the Court to award it attorneys' fees.

128. The Lanham Act gives courts the discretion to award attorneys' fees in "exceptional cases." 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").

129. The Supreme Court has held that an "exceptional" case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); *see*

41

*also Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314–15 (3d Cir. 2014) (holding that *Octane Fitness* controls the interpretation of "exceptional cases" in the Lanham Act).

130. The Court concludes that this is an "exceptional case" in a number of respects and will consider an award of Tropical attorneys' fees.

131. Despite over two years of discovery, Mr. Maduka presented woefully inadequate evidence of his use of the disputed marks in United States commerce, demonstrating the weakness of his litigation position, and Mr. Maduka's discovery responses were rarely without the necessity of motions, judicial cajoling, delay or similar conduct.

132. Moreover, the case was substantially delayed after Mr. Maduka's original counsel withdrew from the case because Mr. Maduka reportedly failed to pay his legal fees. *See* Motion to Withdraw as Attorney (Doc. No. 57).

133. And after Mr. Maduka finally found replacement counsel,[27] he filed renewed discovery motions, prolonging the case even further. *See* Motion for Reconsideration (Doc. No. 76).

134. Finally, although Mr. Maduka is not solely responsible on this point, on the eve of a scheduled jury trial, the parties insisted on having a bench trial instead. Again, this decision prolonged the case further.

135. Therefore, because Mr. Maduka's litigation position was weak and because of the manner in which he litigated this case, the Court concludes that the case is sufficiently "exceptional" to allow for an award of Tropical attorneys' fees.

---

[27] The Court notes that replacement counsel comported himself in all respects professionally.

42

136.    Tropical's counsel is directed to submit to the Court an accounting and application, by way of affidavit and line item description, and contemporaneous exhibits of such attorneys' fees within fourteen (14) days of the date of this Memorandum.

137.    Mr. Maduka may file a response to Tropical's claim of such attorneys' fees within fourteen (14) days of the date of Tropical's submission. The parties may anticipate that the Court will conduct a hearing on the fee application.

## III.    Registrations on File with the Patent and Trademark Office

138.    Finally, Tropical moves the Court to order the PTO to: (1) cancel Mr. Maduka's registration for the DUDU OSUM mark on file with the PTO at No. 3,111,704; and (2) cancel Mr. Maduka's pending registration for the DUDU OSUN mark on file with the PTO at No. 86,843,504.

### A. Mr. Maduka's DUDU OSUM Registration

139.    The Lanham Act gives courts the power to "order the cancelation of [trademark] registrations." 15 U.S.C. § 1119.

140.    Although petitioning the PTO is "'the primary means of securing a cancellation,' district courts can directly 'order cancellation' because of their 'concurrent power' with the [PTO]." *Hipple v. SCIX, LLC*, No. 18-1934, 2019 U.S. App. LEXIS 20111, at *5–6 (3d Cir. 2019) (quoting *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873 (3d Cir. 1992)).

141.    "Where, as here, a registrant's asserted rights to a mark are shown to be invalid, cancelation is not merely appropriate, it is the best course." *Cent. Mfg. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007); *see also Hipple*, at *6 ("This procedure appears to be more efficient and avoids an unnecessary (and potentially costly) adversary proceeding.") (citation and quotations omitted).

43

142. The Court has already determined that Mr. Maduka's trademark registration for the DUDU OSUM mark is invalid because Tropical established nationwide priority to the DUDU OSUN mark, a confusingly similar mark, before Mr. Maduka applied for the DUDU OSUM mark.

143. As discussed above, "the PTO may not issue registration for a trademark if the proposed mark 'consists of or compromises a mark which so resembles a mark registered in the [PTO], or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to conceive.'" *CFE Racing Prods.*, 793 F.3d at 594 (quoting 15 U.S.C. § 1052(d)).

144. Therefore, the finding that Mr. Maduka's DUDU OSUM mark is confusingly similar to Tropical's DUDU OSUN mark is "fatal to [its] validity," *id.*, and the Court will order the PTO to cancel Mr. Maduka's DUDU OSUM registration on file at No. 3,111,704.

### B. Mr. Maduka's DUDU OSUN Application

145. Although the Lanham Act gives courts the authority to "order the cancelation of [trademark] *registrations*," nothing in the Act gives courts the authority to order the cancelation of trademark "*applications*." 15 U.S.C. § 1119 (emphasis added).

146. "Thus, federal courts have held that they have no jurisdiction or power to cancel a pending application which has not matured into a registration." McCarthy on Trademarks and Unfair Competition § 30:113.50 (5th ed.); *see also Zany Toys, LLC v. Peral Enters., LLC*, No. 13-5262, 2015 U.S. Dist. LEXIS 10059, at *13 (D.N.J. Jan. 28, 2015) (holding that courts lack "the power to cancel a pending application which has not matured into a registration") (citation and quotations omitted); *Universal Tube & Rollform Equip. Corp. v. Youtube, Inc.*, 504 F. Supp. 2d

44

260, 266–67 (N.D. Ohio 2007) (same); *GMA Accessories, Inc. v. Idea Nuova, Inc.*, 157 F. Supp. 2d 234, 241 (S.D.N.Y. 2000) (same).

147.     This Court agrees and holds that it does not have the authority to order the cancellation of Mr. Maduka's pending DUDU OSUN trademark application.

148.     Tropical, therefore, must pursue cancellation outside of this litigation of Mr. Maduka's DUDU OSUN application with the PTO.

## CONCLUSION

For the foregoing reasons, judgement will be entered in favor of Tropical and against Mr. Maduka on the parties' competing trademark infringement and unfair competition claims. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

45